**FAMILY TRUST FOUNDATION OF KENTUCKY, INC., et al., Plaintiffs,**

v.

**Stephen D. WOLNITZEK, et al., Defendants.**

**No. CIV.A. 6:04–473–DCR.**

United States District Court, E.D. Kentucky, London Division.

Oct. 19, 2004.

---

104. Royal Policies, Form CG 00 01 01 96, § I.

105. First Royal Policy (Doc. 24 Ex. 3), End. 8; Second Royal Policy (Doc. 24 Ex. 4), Form RSA 1069.

James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, IN, Leroy Arlis Gilbert, Jr., Gilbert Law Office, Corbin, KY, Thomas J. Marzen, Bopp, Coleson & Bostrom, Terre Haute, IN, for Family Trust Foundation of Kentucky, Inc., dba Ken-

tucky Candidate Information Survey, Leonard Lester, Stephen Toadvine, M.D., Plaintiffs.

Escum L. Moore, III, Savage, Elliott, Houlihan, Moore, Mullins & Erdmann, LLP, Lexington, KY, George F. Rabe, Lexington, KY, Robert F. Houlihan, Jr., Moore, Mullins & Erdmann, LLP, Lexington, KY, for Stephen D. Wolnitzek, R.D. Dyche, III, Stephen N. Frazier, William P. Ryan, Jr., Diane Logsdon, Joyce King Jennings.

Linda A. Gosnell, Kentucky Bar Association, Frankfort, Susan C. Sears, Dinsmore & Shohl LLP, Lexington, KY, for Gregory A. Lay.

Linda A. Gosnell, Kentucky Bar Association, Frankfort, Susan C. Sears, Dinsmore & Shohl LLP, Lexington, KY, Michael W. Hawkins, Dinsmore & Shohl, Cincinnati, OH, for Gardner L. Turner, Margaret E. Keane, Phyllis Lonneman, Mark G. Arnzen, Roger W. Hall, Roland D. Mullins, Barbara Allen Howard, Jim Nealy, Linda A. Gosnell, Jay R. Garrett, Dana Cox Nickles, Cindra K. Walker, Steven T. Pulliam, Jenny D. Lafferty, Cary B. Howard.

## MEMORANDUM OPINION AND ORDER GRANTING PARTIAL INJUNCTIVE RELIEF

REEVES, District Judge.

### I. Introduction

This case involves the constitutionality of limitations placed on statements of candidates for judicial office in this Commonwealth. This matter is currently pending for consideration of the Plaintiffs' motion for a temporary injunction.

The judicial canon at the center of this controversy is contained in Rule 4.300 of the Rules of the Supreme Court of Kentucky (captioned, "Kentucky Code of Judicial Conduct"). Together with its commentary, the canon provides as follows:

B. Campaign Conduct

(1) A judge or candidate for election to judicial office:

\* \* \* \* \* \*

(c) shall not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; shall not make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court; and shall not misrepresent any candidate's identity, qualifications, present position, or other facts.

### COMMENTARY

Section 5B(1)(c) prohibits a candidate for judicial office from making statements that appear to commit the candidate regarding cases, controversies or issues likely to come before the court, and prohibits campaigning on issues in a manner designed solely to appeal to public social bias in order to gain a political advantage. As a corollary, a candidate should emphasize in any public statement the candidate's duty to uphold the law regardless of his or her personal views.... Section 5B(1)(c) does not prohibit a candidate from making pledges or promises respecting improvements in court administration. Nor does this section prohibit an incumbent judge from making private statements to other judges or court personnel in the performance of judicial duties.

SCR 4.300, Canon 5B(1)(c).

In addition, the Plaintiffs have challenged the constitutionality of Kentucky's recusal statute which states that:

(2) Any justice or judge of the Court of Justice or master commissioner shall disqualify himself in any proceeding:

(e) Where he has knowledge of any other circumstances in which his impartiality might reasonably be questioned.

K.R.S. § 26A.015(2)(e). Canon 3E(1) contains similar language as its statutory counterpart and provides that a judge must disqualify himself when the "judge's impartiality might reasonably be questioned ..." Kentucky Supreme Court Rule 4.300, Canon 3E(1).

After reviewing the relevant authorities, this Court concludes that the Plaintiffs are not likely to prevail with respect to their challenge to the recusal statute, K.R.S. § 26A.015(2)(e), or Canon 3E(1). In addition, they have not shown that they will suffer irreparable injury if the Court denies the relief requested. Therefore, injunctive relief is not appropriate with respect to those provisions. However, for reasons which will be discussed more fully below, the same conclusion cannot be reached with respect to the judicial canon which seeks to regulate and prohibit statements of candidates for judicial office. Instead, the Court concludes that the Plaintiffs are likely to prevail with respect to this claim. And when all factors relevant to the question of injunctive relief are considered, the Court finds that the Plaintiffs are entitled to such relief with respect to this issue. Accordingly, their motion will be granted with respect to Canon 5B(1)(c).

## II. The Parties and Relevant Facts

The Family Foundation Trust of Kentucky, Inc. ("Family Foundation") is a non-profit corporation organized in 1989. According to its articles of incorporation, Family Foundation exists, *inter alia,* "to promote and encourage among the general public an understanding of and appreciation for the dignity and worth of human life and the family" and "to educate the general public with respect to the philo-

sophical, sociological, psychological, scientific, theological and legal implications of the various ideas and practices of the family ..." Family Foundation alleges that it is not associated with any political candidate, political party or campaign committee. *See* Complaint, ¶ 12.

The individual Plaintiffs, Leonard Lester and Steven Toadvine, M.D., are Kentucky citizens residing in Knox County. Both are registered voters who wish to "receive information" from Family Foundation regarding "the views of judicial candidates for whom they are eligible to vote in November 2004 and in subsequent elections in order to make an informed voting decision." Complaint, ¶ 15.

The Defendants are various individuals sued in their official capacities. They include members of the Kentucky Judicial Conduct Commission, the Kentucky Inquiry Commission, and various counsel for the Kentucky Bar Association.

In July 2004, Family Foundation attempted to obtain responses to a number of questions from judicial candidates so that this information could be announced or otherwise published to Kentucky voters, including Lester and Toadvine. Family Foundation sought to obtain the information through a "2004 Kentucky Candidate Information Survey" which was mailed to all judicial candidates on July 27, 2004 by Project Coordinator Sarah Foster. A copy of the form letter accompanying the survey is attached as Exhibit E–1 to the Plaintiffs' memorandum in support of their motion for a preliminary injunction. [Record No. 3] The survey follows the form letter and is attached as Exhibit E–2 through E–3.

In relevant part, the form letter from Ms. Foster states:

Enclosed is a media survey for judicial candidates running for seats in the Fall's

election. The **Kentucky Candidate Information Survey** has been produced for more than 10 years for legislative candidates but this is the first year it has sought judicial candidates—following the *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) U.S. Supreme Court decision. The survey covers a range of important current judicial issues. Admittedly, some of the questions are tough—helping to differentiate among the candidates. Through there are no "right" or "wrong" answers, please give careful consideration because you will be "speaking" to thousands.

Because of publication and local newspaper deadlines, please return the completed questionnaire in the enclosed envelope by Friday, August 6. Your answers and those of your opponent will be reliably quoted and given to newspapers and interested citizens in your contested district. In addition to newspapers, we also print our own publication (the 2002 edition from one of the Congressional Districts is enclosed for your review) and post answers on our website. In the Fall 2002 election, over 300,000 homes received our information in these ways—that's 600,000 voters! This year we expect even more.

In addition to the form letter, the accompanying survey provided further comments regarding the propriety of providing the requested information. Its introductory paragraphs state:

In *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), the U.S. Supreme Court held that a canon of judicial ethics that prohibited candidates for elective office from "announcing their views on disputed legal or political issues" was unconstitutional. The canon violated the First Amendment because it prohibited speech on the basis of content and because it burdened the free speech of candidates for public office—a category of speech at the core of First Amendment freedoms. Clearly, candidates for elective judicial office may now express their views on legal and political issues without fear of being sanctioned by judicial or legal ethics authorities.

The *Kentucky Candidate Information Survey (KCIS)* certainly recognizes that judicial candidates should maintain actual and apparent impartiality as judges. It recognizes that judicial candidates should not pledge, promise, or commit themselves to any particular result in any particular case in a manner that violates judicial canons or requires judicial recusal. At the same time, voters need to know the views of judicial candidates in order to make intelligent and conscientious decisions regarding candidates' values and views on the law. Thus, this survey is intended to elicit candidates' views on issues of vital interest to citizens without requiring judicial candidates to violate ethical standards or compromising judicial impartiality.

*KCIS* recognizes that all of your responses are subject to the judicial obligations to follow binding precedents of higher courts and applicable constitutional and statutory provisions, to honor *stare decisis,* and to decide any future case based on the law and facts of that case. YOUR RESPONSES INDICATE YOUR CURRENT VIEW ON THE LEGAL ISSUES AND DO NOT CONSTITUTE ANY PLEDGE, PROMISE, OR COMMITMENT TO RULE IN ANY PARTICULAR WAY IF THE LEGAL ISSUE INVOLVED COMES BEFORE YOU FOR DECISION.

The survey lists seven questions for response, followed by a request that the

judicial candidate identify his or her membership in a number of organizations as well as the person's church affiliation. The initial seven questions request the following information:

1. Which of the following former U.S. Presidents best represents your political philosophy?

 *John F. Kennedy/Jimmy Carter/Ronald Reagan/George Bush (former)* (circle one)

2. Which of the current Justices of the U.S. Supreme Court most reflects your judicial philosophy?

 *Rehnquist/Stevens/O'Connor/Scalia/Kennedy/Thomas/Souter/Ginsburg/Breyer* (circle one)

3. Rate your judicial philosophy on a scale of 1–10 with strict constructionist being a 10 and a living document approach being a 1:

 _____

Please answer the following survey by checking whether you agree with, disagree with, are undecided about, or decline to respond to the proceeding numbered propositions.

## MARRIAGE

4. In *Baker v. State,* 170 Vt. 194, 744 A.2d 864 (1999), the Vermont Supreme Court held that the Vermont Constitution required that same-sex couples be permitted to enter into civil unions that encompass state rights that attach to legal marriage.

 **I believe that the Kentucky Constitution does not require that same-sex couples be permitted to enter into civil unions that encompass those state rights that attach to legal marriage.**

 _____Agree_____Disagree_____Undecided_____Decline to Respond

## BIOETHICS

5. Some have suggested that destructive human embryo research and human cloning are constitutionally protected forms of scientific activities in themselves or as incidents of human reproduction.

 **I believe that the Kentucky Constitution does not recognize any right to destructive human embryo research or human cloning.**

 _____Agree_____Disagree_____Undecided_____Decline to Respond

## RELIGIOUS FREEDOM

6. Several states are attempting to decide if it is lawful to display the Ten Commandments along with other historically significant documents from public buildings.

 **I believe that the Kentucky Constitution does not require the removal of the Ten Commandments displayed with other historically significant documents from public buildings.**

 _____Agree_____Disagree_____Undecided_____Decline to Respond

## INDECENCY/PORNOGRAPHY

7. Missouri has tried to raise the minimum age for working as a dancer in a strip club from age 18 to age 19 in order to limit the number of high school aged girls from working in these clubs.

 **I believe that neither the U.S. nor the Kentucky Constitution is violated by legislation that raises the age for working as strippers in strip clubs from 18 to 19 years of age in order to limit the number of high**

**school aged girls working as strippers in such clubs.**

_____Agree_____Disagree_____Undecided_____Decline to Respond

Family Foundation also has attached to its memorandum the responses of several judicial candidates. While several individuals declined to answer any of the questions or identify their association with or memberships in the organizations listed, others provided answers to some of the questions but refused or declined to answer others. For example, Audra Eckerle, a sitting judge of the Jefferson District Court, fell within the first group who declined to provide a response to any of the questions posed. Instead, she responded that Supreme Court Rule 4.300, Canon 5B(1)(c), limited her ability to respond. More specifically, she indicated that:

As you may or may not know, the Kentucky Judicial Ethics Committee has issued a Memorandum Opinion that the United States Supreme Court case of *Republican Party of Minnesota v. White* does not impact Kentucky's cannon [sic] on judicial campaign statements.

\* \* \* \* \* \*

Accordingly, I must respectfully decline to answer the questions that you have tendered to me. I believe in good faith that the Cannons [sic] of Judicial Conduct require me to make this decision.

[Record No. 3; Exhibit F–1] It is interesting to note that while Judge Eckerle refused to answer the questions presented to her or list any membership or connection with the organizations identified on the last page of the survey, she submitted a resume listing her accomplishments including her affiliation with several other associations. [See Record No. 3; Exhibit F–7]

Likewise, Anne Haynie, a candidate for Jefferson District Court, Division 15, indicated in response to the Project Coordinator that, "[a]lthough you accurately stated the U.S. Supreme Court decision, the Kentucky Supreme Court has issued a directive that prohibits Judges and Judicial Candidates from expressing an opinion on the issues presented in your survey." [Record No. 3; Exhibit F–10]

Judge Michael L. Henry, a District Judge for Pulaski and Rockcastle Counties, submitted a response similar to Judge Eckerle's response. However, he noted an additional, unrelated reason for his refusal to respond to the survey.

The best information I have been able to gather indicates that by responding to the survey, judicial candidates would run the risk of violating Canon 5A(2) and 5B(1)(c) of the Kentucky Code of Judicial Conduct. The most recent letter I have been able to obtain from Judge James Bowling, Chairman of the Judicial Ethics Committee, a copy of which is enclosed, informed Kentucky judges that the Canon remains effective as promulgated after *Republican Party of Minnesota v. White*, which you cited in your letter. I have spoken with the Executive Secretary of the Committee and was advised that until further ruling the cited Canons remain effective.

Another matter that concerned me somewhat is that the deadline for response to the Survey, August 6, 2004, precedes the candidate filing deadline for the office I am seeking, which is August 10, 2004. Any candidates filing after the Survey deadline will apparently be precluded from participation anyway, which doesn't seem quite fair.

[Record No. 3; Exhibit F–11]

The letter referenced in Judge Henry's response and forwarded to Family Foundation is dated October 10, 2002, and ad-

dressed to Justices, Judges and Judicial Candidates. It is on the letterhead of the Ethics Committee of the Kentucky Judiciary and signed by James L. Bowling, Circuit Judge and Chair of the Committee. This letter/memorandum provides what appears to be the Committee's most recent *formal* pronouncement regarding the viability of Canon 5B(1)(c) following *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

> The Kentucky Judicial Ethics Committee issues this memorandum adopting the position of the Judicial Conduct Commission issued August 5, 2002. Like the Judicial Conduct Commission, the Judicial Ethics Committee agrees that the recent United States Supreme Court case *Republican Party of Minnesota v. White* does not impact Kentucky's canon on judicial campaign statements. The announce clause struck down as unconstitutional was repealed by the Kentucky Supreme Court in the case of *J.C.J.D. v. R.J.C.R.*, Ky., 803 S.W.2d 953 (1991). Therefore, Canon 5(B)(1)(c) of the Kentucky Code of Judicial Conduct is not affected by the ruling on the Minnesota canon, and remains effective as promulgated by the Supreme Court of Kentucky.

[Record No. 3; Exhibit F–12]

Jeffrey Lawless, a Somerset attorney running for judicial office, also responded to the Project Coordinator but declined to provide any responses to the questionnaire. He stated, in part, that:

> Please be advised that the Kentucky Code of Judicial Conduct provides that "A judge or candidate for election to judicial office ... shall not make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court," and "shall main-

tain the dignity appropriate to judicial office." In abiding by the Code, I am promoting my qualifications for this office, but I do not feel it appropriate for me or any other candidate for judicial office, to comment with respect to the various judicial issues posed in your survey.

[Exhibit F—15]

A number of other candidates and sitting judges either stood behind their interpretation of the subject canon, Judge Bowling's 2002 memorandum, or more recent comments by Judge Bowling in refusing to respond to some or all of the issues presented in the questionnaire. For example, Judge A.C. McKay Chauvin of the Jefferson Circuit Court indicated that she could not respond as a sitting judge because, "the Kentucky Judicial Conduct Commission has directed that the recent United States Supreme Court decision in *Republican Party of Minnesota v. White* does not affect Kentucky's cannon [sic] on judicial campaign statements as promulgated by the Supreme Court of Kentucky." [Exhibit F–16] However, Judge Roderick Messer of the Laurel and Knox Circuit Courts indicated that, "[u]pon receipt of your letter, *I contacted Circuit Judge James Bowling, who is the Chairman of the Kentucky Judicial Ethics Committee. I was advised by Judge Bowling that the Judicial Commission had issued an order saying White did not apply to Kentucky and that the Judicial Ethics Committee had adopted that position.*" [Exhibit F–17] (Italics added.) Conversely, J. Ross Steinetorf claims to have relied upon his own reading of the rules in concluding that he was "prohibited from answering [the] questionnaire." [Exhibit F—21]

It is equally noteworthy that two candidates for Justice of the Supreme Court of Kentucky also received copies of the questionnaire but offered differing opinions re-

garding their ability to respond to the issues raised. For example, former Circuit Judge Will T. Scott of Pikeville returned a partially-completed survey responding to questions 1, 2, 3 and 7. In addition, he identified membership in one of the organizations listed as well as his church affiliation. He declined to respond to questions 4, 5 and 6 and, with respect to question 4, he explained that "under Cannon [sic] 5 of the Ky. Sup.Ct. rules (4.300) I cannot answer these questions although I would like to—I would note that the Ky. Const. does not have the 'common benefits' clause under which the Vt. Case was decided." [Exhibit F—19, 20]

Conversely, Janet Stumbo, a sitting Justice of the Supreme Court of Kentucky, reviewed the questionnaire but declined to answer any of the questions posed. In explaining her position, Justice Stumbo stated that,

> I have received and have reviewed the Survey forwarded to me by your organization. I regret that I am unable to participate in this educational endeavor. Canon 5(B)(1)(c) of the Kentucky Code of Judicial Conduct states that a judge "shall not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office [and]; shall not make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court...."
> The Ethics Committed of the Kentucky Judiciary and the Judicial Conduct Committee have both issued memoranda stating that the United States Supreme Court decision in *Republican Party of Minnesota v. White* does not impact the Kentucky Canon on judicial campaign statements and that our canon remains effective. I enclose for your information a copy of the Ethics Com-

mittee memorandum, dated October 10, 2002.

[Exhibit F—22]

In summary, it appears that no identified candidate for any judicial office has fully responded to the questionnaire presented by the Family Foundation. However, the reasons for individual refusals vary from reliance upon the 2002 memorandum from the Chairman of the Ethics Committee (and discussions with the Chairman) to the individual's own interpretation of the limitations imposed by the canon. And other than Judge Messer, it does not appear that any judicial candidate has requested a formal or informal opinion concerning whether he or she may respond to any of the *specific* questions posed by the questionnaire.

### III. Procedural History

The Plaintiffs filed this action on September 23, 2004, seeking declaratory and injunctive relief. At the time the Complaint was filed, the Plaintiffs also filed a motion seeking to have the hearing on their request for injunctive relief consolidated with a trial on the merits. [Record No. 5] In addition, the Plaintiffs sought to have final resolution of this matter expedited. [Record No. 4]

A scheduling hearing was held on September 28, 2004, in order to establish briefing deadlines and set a time for hearing on the Plaintiffs' request for injunctive relief. Although earlier dates were offered, the Plaintiffs' attorneys chose to have their request for injunctive relief heard on October 15, 2004. The Defendants generally objected to a hearing being scheduled on the request for injunctive relief at any time in the near term, claiming they needed substantial time to prepare for such a hearing.

On October 12, 2004, the Court denied the Plaintiffs' request for consolidation of

the hearing on their request for injunctive relief with the trial on the merits, relying, in part on the Supreme Court's holding in *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits."). [Record No. 19] And on October 15, 2004, the parties presented arguments regarding their respective positions concerning the Plaintiffs' request for injunctive relief.

During the September 28th and October 15th hearings, the parties discussed and debated preliminary issues of standing, ripeness, mootness and other related issues which are addressed below. In addition, based on the concerns expressed by the Court on September 28th, the Plaintiffs also tendered the affidavit of Ken Ostrander, Executive Director of Family Foundation. This affidavit cites Supreme Court and Sixth Circuit authorities supporting their position that standing requirements have been met in this action. [Record No. 16] As indicated during the October 15th hearing, the Court will consider this affidavit as supplemental legal authority in support of the Plaintiffs' request for injunctive relief.

## IV. Standing

■ The Defendants argue that the Plaintiffs lack standing because the relevant ethical rules do not apply to them and because they have not suffered a direct, concrete, and particularized injury. They assert that, at best, these Plaintiffs suffer a generalized grievance, which they share with every other eligible voter in Kentucky. The Plaintiffs disagree and assert that they have met all standing concerns in this case.

In addressing this argument, it must be noted initially that federal courts are courts of limited jurisdiction. Further, two types of standing must be met for a federal court to exercise jurisdiction: prudential standing, which is a judicially-imposed limitation on the exercise of federal jurisdiction, and constitutional standing, which embodies the constitutional "case or controversies" requirement. *Elk Grove Unified Sch. Dist. v. Newdow,* —— U.S. ——, ——, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004).

The Supreme Court sought to clarify the principle of "prudential standing" in *Elk Grove,* noting that "[a]lthough we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Id.* (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). It has also held that

[w]ithin the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing. Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. Litigants, therefore, are permitted to

challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–957, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (quotation omitted); *see also Eisenstadt v. Baird*, 405 U.S. 438, 445 n. 5, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) ("in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech"). As the Court found, "[f]acial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Id.* at 958, 104 S.Ct. 2839.

In the present action, the Plaintiffs satisfy the prudential concern of stating a claim which falls within the zone of interests implicated by the First Amendment because the right to freedom of speech is designed to protect all citizens' rights to listen and to express opinions. *See Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."); *accord Neinast v. Bd of Trustees of the Columbus Metro. Library*, 346 F.3d 585, 591 (6th Cir.2003); *Spargo v. N.Y.*

*State Comm'n on Judicial Conduct*, 351 F.3d 65, 83 (2d Cir.2003) ("it is well-established that the First Amendment protects not only the right to engage in protected speech, but also the right to receive such speech").

The second prudential standing concern is not present here. The Plaintiffs in this case have a right to receive political information that is independent of the judicial candidates' right to express their opinion because the Plaintiffs claim they were denied their right to receive information—a right protected by the First Amendment. *Stanley*, 394 U.S. at 564, 89 S.Ct. 1243; *Neinast*, 346 F.3d at 591; *Spargo*, 351 F.3d at 83; *see also Akins*, 524 U.S. at 21, 118 S.Ct. 1777.

In *Spargo*, the plaintiffs challenged New York rules on judicial conduct, including a prohibition against "engaging in partisan political activities that are unrelated to their own campaign." *Spargo*, 351 F.3d at 67. One of the plaintiffs was a judicial candidate, while the other two were merely supporters of the judge. The Second Circuit noted that the two supporters had their own First Amendment right to receive information that was independent of the judge's right to speak.[1] *Id.* at 83–84.[2]

■ With respect to constitutional concerns, Article Three, Section Two of the United States Constitution limits the jurisdiction of federal courts to the resolution of cases and controversies. The doctrine of standing helps federal courts identify which matters are properly considered cases and controversies for purposes of jurisdiction. *Lujan v. Defenders of Wild-*

---

1. The court also noted that the candidate's supporters had no greater rights than the candidate and that their claims were "unavoidably intertwined and inseparable." *Id.* at 84. The Plaintiffs in this case do not claim to hold greater rights than the judicial candidates.

2. The final prudential standing concerns discussed in *Newdow, i.e.,* generalized grievances, is intertwined in this Court's constitutional standing analysis and, therefore, will be discussed *infra*.

*life,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Indeed, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* at 560, 112 S.Ct. 2130. The Supreme Court has elucidated the standing doctrine by setting forth three requirements: (1) the plaintiff must have suffered a concrete and particularized "injury in fact" that is actual or imminent, (2) there must be a causal connection between the injury and the conduct complained of, and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61, 112 S.Ct. 2130 (citations omitted). Moreover, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof...." *Id.* at 561, 112 S.Ct. 2130 (citations omitted).

■ In *Lujan,* the Supreme Court discussed the different standing analysis employed depending on whether the plaintiff is the direct subject of government regulation or, alternatively, if the plaintiff is only injured as a third-party:

[w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred ... in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlaw-

ful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

*Id.* at 561–62, 112 S.Ct. 2130 (citations omitted) (emphasis in original). Therefore, while it is "substantially more difficult" for a plaintiff to have standing when the government is regulating *someone else's* speech, *Joseph H. Munson Co.* and *Baird* instruct that this analysis is relaxed when examining a First Amendment claim.

The Supreme Court addressed this issue in *Fed. Election Comm'n v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). The plaintiffs in the case were a group of voters who sought to challenge a decision of the Federal Election Commission ("FEC") which held that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee," as defined by the Federal Election Campaign Act of 1971 ("FECA"), and thus was not required to make disclosures regarding its membership contributions and expenditures. The plaintiffs filed a complaint with

the FEC, pursuant to 2 U.S.C. § 437g(a)(1), challenging its decision. When the FEC ruled against them, the plaintiffs filed suit in federal court, pursuant to 2 U.S.C. § 437g(a)(8)(A). The FEC argued that the plaintiffs lacked both prudential and constitutional standing.

The Court first noted that the FECA specifically authorized the type of suit initiated by the plaintiffs, thus satisfying much of the prudential standing concerns. *Akins,* 524 U.S. at 20, 118 S.Ct. 1777. The Court next addressed the issue of constitutional standing, turning first to the requirement of injury in fact:

> [t]he "injury in fact" that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors . . . and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular.

*Id.* at 21, 118 S.Ct. 1777.

Having concluded that the inability of voters to obtain information relevant to their vote constituted a concrete and particular injury in fact, the Court turned to the most troubling aspect of the plaintiffs' standing: the fear that their claim represented only a "generalized grievance," which could invalidate both prudential and constitutional standing. It pointed out that "[w]hether styled as a constitutional or prudential limit on standing, the Court has sometimes determined that where large numbers of Americans suffer alike,

the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance." *Id.* at 23, 118 S.Ct. 1777 (citations omitted).

The Court further explained that in most cases in which the harm is widely shared and "generalized," the harm to a plaintiff is abstract and if a Article Three court ruled on such claims, it would be issuing an impermissible advisory opinion. *Id.* at 24, 118 S.Ct. 1777. This association between harm that is both widely shared and abstract, however, "is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *Id.* (citation omitted). It concluded that "the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize ,its vindication in the federal courts." *Id.* at 24–25, 118 S.Ct. 1777.

The plaintiffs in this case similarly challenge an informational injury relating to voting, "the most basic of political rights." In *Akins,* the plaintiffs sued pursuant to 2 U.S.C. § 437g(a)(8)(A). Here, the plaintiffs' suit is authorized by the First and Fourteenth Amendments, by virtue of the Civil Rights Act of 1871, 42 U.S.C. § 1983. The Plaintiffs claim they were denied their right to receive information, which is protected by the First Amendment. *Stanley,* 394 U.S. at 564, 89 S.Ct. 1243; *Neinast,* 346 F.3d at 591; *Spargo,* 351 F.3d at 83; *see also Akins,* 524 U.S. at 21, 118 S.Ct. 1777. Congress created a private cause of action in Section 1983, which "provides for civil liability on the part of any person who, under color of state law, subjects any U.S. citizen . . . to a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United

States," which includes, of course, First Amendment protections. *Cullinan v. Abramson*, 128 F.3d 301, 306–307 (6th Cir. 1997). Thus, as in *Akins*, Congress has created a cause of action for the plaintiffs and their injury is sufficiently concrete and particularized to satisfy the prudential standing requirements and the constitutional "injury in fact" requirement.

The second prong of constitutional standing, causation, also presents a difficult issue for resolution. The Plaintiffs claim that they are injured because judicial candidates will not answer their survey on judicial issues due to the restrictions found in Canon 5B(1)(c) and the Kentucky Supreme Court's application of that Canon. As they point out, numerous judicial candidates refused to answer the surveys, stating that they believed that Canon 5B(1)(c) prevented them from answering the questions. (Pfs.' Memo in Supp. of Mot. for Prelim. Inj., Ex. F) Of course, the candidates may be using the canon as a pretense to avoid answering difficult and divisive political questions. In that case, it would not be the canon which chilled political speech, but rather, the candidates' own legitimate choices on what speech to engage in.

The questionnaires provided by the Plaintiffs, however, explicitly state that the candidates refuse to answer due to their belief that answering the questionnaire might violate Canon 5B(1)(c). Assuming, *arguendo*, that the answers were merely a pretext to avoid answering difficult questions, standing in such a First Amendment case may exist simply from a "judicial prediction or assumption that the statute's very existence may cause others not before

the court to refrain from constitutionally protected speech or expression." *Joseph H. Munson Co.*, 467 U.S. at 956–57, 104 S.Ct. 2839 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Moreover, in the more relaxed context of a First Amendment claim, the letters from the candidates satisfy the *Lujan* causation requirement. At this stage of the controversy, there is nothing in the record to indicate that the judicial candidates were only using the canon as an excuse not to answer the survey.

Finally, a preliminary injunction would redress the Plaintiffs' injury by removing the alleged barrier to free speech, *i.e.*, Canons 5B(1)(c). While it would certainly not compel a candidate to answer the questionnaire, it would remove the candidates' stated reason for declining to answer the questions. It would thus remove any government-imposed barriers to their right to receive candidate information.[3]

## V. Ripeness

In addition to questions of standing, this case also presents serious questions of ripeness. While standing focuses on who may bring suit, ripeness focuses on whether the facts are sufficiently developed to permit adjudication. *Amelkin v. McClure*, No. 94–6161, 1996 WL 8112, *4, 1996 U.S.App. LEXIS 1414, at * 13 (6th Cir. Jan. 9, 1996); *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 n. 3 (11th Cir.1991). "The basic rationale of the ripeness doctrine is to prevent the courts, through premature adjudication, from entangling

---

**3.** The Plaintiffs might also have *jus tertii* standing to assert the rights of the judicial candidates to disseminate their political positions. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623–24 n. 3, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) (explaining *jus tertii* standing). Because Plaintiffs have their own First Amendment right to receive information, as discussed *supra*, it is not necessary to engage in a separate *jus tertii* analysis.

themselves in abstract disagreements." *Adult Video Ass'n v. United States Dep't of Justice,* 71 F.3d 563, 567 (6th Cir.1995) (quotation omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 301, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quotations omitted).

■ In a pre-enforcement challenge, ripeness typically exists "only if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Nat'l Rifle Ass'n of Am. v. Magaw,* 132 F.3d 272, 284 (6th Cir.1997). Three factors are relevant to this review: (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings. *Adult Video Ass'n,* 71 F.3d at 568. Finally, "[r]ipeness analysis is relaxed for First Amendment cases involving a facial challenge to a regulation because courts see a need to prevent the chilling of expressive activity." *Currence v. City of Cincinnati,* 28 Fed.Appx. 438, 441–42 (6th Cir.2002); *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499 (10th Cir.1995).

■ In this case, the Plaintiffs' alleged harm has come to pass because they are being denied the right to receive crucial voting information, purportedly because of Canon 5B(1)(c). While it is true that the state may choose not to enforce the canon against judicial candidates who answer the survey, the claimed injury currently exists because of the chill caused by the very existence of the canon (and its interpretation, discussed *infra*). The independent

right to receive candidate information is jeopardized by the canons. Second, the factual record is sufficiently developed: the Plaintiffs have submitted their survey and responses to the survey. Unlike obscenity cases where "determinations often require analysis of the particular factual contexts in which the [pornographic material] is created, promoted, and disseminated," *Adult Video Ass'n,* 71 F.3d at 568, this political speech case does not require an extensive factual inquiry into the particular circumstances of the survey's creation and dissemination.

In addition, Kentucky courts have had several opportunities to interpret the canons, thus adding to the factual record of this case. *See Texas,* 523 U.S. at 301, 118 S.Ct. 1257 (noting that state had yet to interpret statute in question, thus reducing the case's "fitness for adjudication"). Finally, the Plaintiffs could suffer irreparable harm if their case is not heard because their interest in learning information from the candidates is time-sensitive and becomes nearly useless after the November 2nd general election. Thus, in this First Amendment case alleging a chilling of free speech relating to voting, "the most basic of political rights," the Plaintiffs' injury relating to Canon 5B(1)(c) appears to be sufficiently "ripe" to merit adjudication.

## VI. Abstention

The Defendants also argue that the Court should abstain from hearing this action. In raising this argument, the Defendants acknowledge that there are various circumstances under which abstention is proper. Specifically, the Defendants note that abstention by a federal court may be necessary in the following situations: (1) where a case presents a federal constitutional issue which could be mooted or presented in a different posture by a determination of state law, also known as

the *Colorado River* or *Burford-type* abstention; (2) where a case presents a difficult question of state law and bears upon policy issues of substantial importance which transcend the case at bar, also called *Thibodaux*-type abstention; (3) where there is a parallel state proceeding at the time the federal action is instituted, also known as *Younger*-type abstention. There are three distinguishable line of cases, which set forth the various abstention doctrines as set forth above. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

The Defendants contend that the facts of this case indicate that *Younger*-type abstention is most applicable in this case. However, they acknowledge that the *Younger* abstention doctrine is not available due to the fact that there is no parallel state proceeding. Without citing which of these abstention doctrines is, in fact, applicable in this case, the Defendants simply assert that "the general principles of comity recognized in the *Younger* abstention cases are also applicable under other abstention doctrines." [Record No. 20, p. 16]

As a general rule, district courts have an obligation and a duty to decide cases properly before them, and "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236 (1976). In the present case, the requirements for the abstention doctrines raised by the Defendants have not been met. In addition to the fact that there is no parallel state court proceeding, this action involves federal constitutional issues; namely, the First Amendment to the United States Constitu-

tion. And while this action involves the constitutionality of two state judicial canons and a state statute, the outcome of this litigation turns on an interpretation of federal constitutional law, not state law. These are certainly matters which may be resolved by this Court.

## VII. The Standard for Injunctive Relief

In *In re DeLorean Motor Co.*, 755 F.2d 1223 (6th Cir.1985), the Sixth Circuit set forth the relevant considerations for examining a motion for a preliminary injunction. The four factors are: (1) the likelihood of success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction. *Id.* at 1228. As the Sixth Circuit has noted most recently in *Chabad of Southern Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir.2004), when ruling on a motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the district court must consider and balance these four factors. "Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *DeLorean*, 755 F.2d at 1229.

The Defendants claim that injunctive relief is not available to the Plaintiffs under Section 1983, noting that in actions taken against judicial officers in their judicial capacity, "injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983. Assuming that the Defendants are "judicial officers," this argument fails because declaratory relief is unavailable at this time since the Plaintiffs are merely seeking emergency relief. A declaratory judgment has the same "force and effect" as a final judgment and thus is inappropriate in a preliminary hearing. 28

U.S.C. § 2201. In fact, the Defendants opposed the Plaintiffs' motion to consolidate the preliminary hearing with a hearing on the merits. Therefore, the only remedy available to the Plaintiffs, prior to a full trial on the merits, is a preliminary injunction. Section 1983 does not preclude injunctive relief because declaratory relief is unavailable for the Plaintiffs at this time.

## VIII. Canon 5B(1)(c)

### A. History

Section 121 of the Kentucky Constitution confers the authority to regulate the conduct of the judiciary upon the Kentucky Supreme Court. In carrying out this task, the Kentucky Supreme Court has promulgated the Kentucky Code of Judicial Conduct ("Code"), codified in Rule 4.300 of the Rules of the Kentucky Supreme Court. The Code is interpreted by both the state courts and the Ethics Committee of the Kentucky Judiciary ("Ethics Committee")[4]. Its enforcement is carried out by the Judicial Conduct Commission[5] ("Commission")[6].

Canon 5 deals with "inappropriate political conduct" by judges and those seeking judicial office. Canon 5B(1)(c) contains both a "pledges or promises" clause ("promises clause") and a "commit clause," both of which are challenged in this action. It provides that a judge or candidate to judicial office:

shall not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties

of the office; shall not make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court; and shall not misrepresent any candidate's identity, qualifications, present position, or other facts. Kentucky Supreme Court Rule 4.300, Canon 5B(1)(c). This canon replaced the repealed Canon 7B(1) which provided that a judge or candidate for judicial office "should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; (or) announce his views on disputed legal or political issues." Kentucky Supreme Court Rule 4.300, Canon 7B(1)(c) (1991). This provision thus contained a promises clause and an "announce clause."

In *J.C.J.D. v. R.J.C.R.*, 803 S.W.2d 953 (Ky.1991) a panel of special justices for the Kentucky Supreme Court concluded that Canon 7B(1)(c) violated the First Amendment. In striking it down, the court noted that

the existing Canon strictly prohibits dialogue on virtually every issue that would be of interest to the voting public. Inasmuch as the purpose of an election is to give the electorate the opportunity to become informed on a judicial candidate's qualifications for the position, which would include, among other things, knowledge of the law, and personal views and beliefs, the Canon fails in this respect. Instead, we are encouraging the public to judge candidates for our judiciary by not much more than their personal appearances. We believe

---

4. Kentucky Supreme Court Rule 4.310 allows the Ethics Committee to issue advisory opinions when requested by judges, trial commissioners, judicial candidates, or when the Committee sees fit to do so. Any person affected by an opinion can seek review with the Kentucky Supreme Court.

5. The Judicial Conduct Commission was previously known as the Judicial Retirement and Removal Commission.

6. Jurisdiction is vested in the Commission pursuant to Kentucky Supreme Court Rule 4.020.

a well informed electorate is essential to the democratic election process guaranteed by the Kentucky Constitution. The rights of the voting public to hear what a candidate has to say is a compelling one. We further believe candidates for judicial office can announce their views on legal and political issues without jeopardizing the integrity and independence of the legal system or undermining the impartiality of the judiciary.

*Id.* at 956. The court agreed with the respondent that "pledges of specific judicial conduct on pending cases" and "promises or predispositions of cases or issues that are likely to come before the courts that might reflect a judge's impartiality" cannot be tolerated. *Id.* However, the court felt that the canon could be written more narrowly to "outlaw discussion of pending or future litigation." *Id.*

Following this opinion, the Rules of the Kentucky Supreme Court regarding judicial campaigns were re-written in their present form. As discussed *supra*, the new canon dropped the announce clause, added the commits clause and left the promises clause in place. Shortly after the *J.C.J.D.* opinion, a federal district court heard a case challenging the newly-amended canon. *Ackerson v. Ky. Judicial Retirement and Removal Comm'n*, 776 F.Supp. 309 (W.D.Ky.1991).

Ackerson was a candidate for the Kentucky Court of Appeals. He sought to "make pledges, promises and statements which would commit or appear to commit him with respect to administrative matters in the Kentucky Court of Appeals." *Id.* at 311. Concluding that "strict scrutiny" analysis was appropriate, the court determined that the state had a compelling interest in an impartial judiciary, noting that "[a]n evenhanded, unbiased and impartial judiciary is one of the pillars upon which our system of government rests." *Id.* at

313. The court next considered whether Canon 5B(1)(c) (which was then known as Canon 7B(1)(c)) was narrowly tailored to the state's compelling interest. It concluded that commenting on administrative matters, as opposed to adjudicatory matters, was not related to the state's interest in having an impartial judiciary. *Id.* at 314. Although the court held that the canon violated Ackerson's First Amendment rights as applied to commenting on administrative matters, it determined that the canon was facially valid. Thus, the court enjoined the defendant from enforcing the canon with respect to comments on administrative matters only.

Three years later, the Supreme Court of Kentucky ruled on its first challenge to the judicial campaigning canon since it struck down the previous version in the *J.C.J.D.* case. *Deters v. Judicial Retirement and Removal Comm'n*, 873 S.W.2d 200 (Ky. 1994). Deters ran unsuccessfully for the remainder of a district court judgeship in Kenton County. He took out advertisements in *The Messenger* and *The Kentucky Post* which stated that "Jed Deters is a Pro–Life Candidate." *Id.* at 201. A complaint was filed against him following the election. The Commission reviewed the matter and concluded that Deters had

publicly announced his view on the abortion issue for the admitted purpose of obtaining support from voters interested in that issue. In doing so, he attempted to obtain an unwarranted and illegal advantage in the election over his opponents. In so acting, he violated Canon 7B(1)(c) by making statements that commit or appear to commit the candidate to a position with respect to cases, controversies or issues that are likely to come before the court.

*Id.* at 202.

Deters appealed directly to the Supreme Court of Kentucky, as provided for in Ken-

tucky Supreme Court Rule 4.310. In his appeal, he alleged, *inter alia*, that Canon 7B(1)(c) violated his First Amendment rights. However, the supreme court disagreed. Citing *Ackerson*, the court concluded that the state had a compelling interest in limiting a judicial candidate's speech "because the making of campaign commitments on issues likely to come before the court tends to undermine the fundamental fairness and impartiality of the legal system." *Id.* at 205.[7]

The Supreme Court of Kentucky most recently dealt with the First Amendment implications of Canon 5B(1)(c) in *Summe v. Judicial Retirement and Removal Comm'n*, 947 S.W.2d 42 (Ky.1997). Judge Summe successfully ran for Circuit Judge in Kenton County in November 1994. During the campaign, she distributed a letter written by her cousin which described a child abuse case handled by her opponent, Judge Trusty. The letter noted that while the prosecutor argued for a ten-year sentence for the abuser, the judge imposed only a five year sentence and then probated the sentence, causing the defendant to spend only 153 days behind bars. The letter stated that "it is time to judge our judges" and "to stop the abuse instead of treating it." *Id.* at 46. "Please ·join me," the letter concluded, "in stopping the abuse and vote for a person who will let no one walk away before justice is served. [Summe] has concern for the victim." *Id.* First, Judge Summe argued that this letter constituted neither a pledge, promise, nor a commitment. The court disagreed, noting that "[w]hile in isolation, a judge who 'will let no one walk away before justice is served' is something to which all should aspire, in the context of the present judicial campaign, it represented appellant's commitment to prevent the probation of child abusers." *Id.* at 47.

Judge Summe next argued that Canon 5B(1)(c) violated her First Amendment rights. The court quickly dismissed this argument, citing *Deters* and *Ackerson.* It further noted that *J.C.J.D.* was not useful to Judge Summe because the judicial campaign canon had been amended to remove the announce clause. *Id.*

Five years later, the United States Supreme Court entered the fray in *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). The case dealt with Minnesota's ethical rules for judicial campaigns. Although the rules contained both a pledges and promises clause as well as an announce clause, the court considered only the constitutionality of the announce clause because the promises clause was not challenged by the petitioners. *Id.* at 770, 122 S.Ct. 2528.

Gregory Warsal, one of the petitioners, ran for associate justice of the Minnesota Supreme Court. During the campaign he criticized several Minnesota Supreme Court decisions on issues including crime, welfare, and abortion. *Id.* at 768, 122 S.Ct. 2528. Complaints were filed against him for violation of the announce clause, but were later dismissed. He ran again in 1998 and sought an advisory opinion from the Minnesota Lawyers Professional Responsibility Board as to whether the announce clause would be enforced. It refused to answer his request, so he and the Republican Party of Minnesota filed suit in federal district court to enjoin enforcement of the announce clause, arguing that it violated the First Amendment.

In delivering the Court's opinion in *White*, Justice Scalia recognized that "the announce clause both prohibits speech on the basis of its content and burdens a

---

7. Justice Wintersheimer wrote a thoughtful dissent which is discussed *infra*.

category of speech that is at the core of our First Amendment freedoms—speech about the qualifications of candidates for public office." *Id.* at 774, 122 S.Ct. 2528 (quotation omitted). Thus, strict scrutiny applied, meaning that the state had to prove that the clause was "(1) narrowly tailored, to serve (2) a compelling state interest." *Id.*

The Court first considered whether a compelling state interest was implicated. It identified three possible compelling state interests protected by the announce clause: (1) preserving the impartiality of the judicial system by removing bias for or against either *party* in a court proceeding; (2) preserving the impartiality of the judicial system by removing preconceptions in favor of or against a particular *legal view*; and (3) preserving the impartiality of the judicial system by promoting "open-mindedness" by seeking "to guarantee each litigant not an equal chance to win" a case, "but at least some chance of doing so." *Id.* at 775–84, 122 S.Ct. 2528.

The Court did not discuss whether "removing preconception in favor of or against a particular legal view" was a compelling interest, instead dismissing this justification on the ground that the announce clause was not necessary to achieve this goal. It noted that the announce clause restricts speech regarding particular *issues,* not *parties,* conceding that

> when a case arises that turns on a legal issue on which the judge (as a candidate) had taken a particular stand, the party taking the opposite stand is likely to lose. But not because of any bias against that party, or favoritism toward the other party. *Any* party taking that position is just as likely to lose. The judge is applying the law (as he sees it) evenhandedly.

*Id.* at 776–77, 122 S.Ct. 2528. Thus, the court rejected this justification of the announce clause.

Next, the Court determined that removing preconceptions in favor of or against a particular *legal view* is not a compelling state interest. The Court concluded that "[a] judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice," for two reasons: (1) "it is virtually impossible to find a judge who does not have preconceptions about the law" and (2) "[p]roof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of a lack of qualification, not a lack of bias." *Id.* at 777–78, 122 S.Ct. 2528 (quotation omitted). The Court further held that the goal of maintaining the *appearance* of impartiality was not compelling because "avoiding judicial preconceptions on legal issues is neither possible nor desirable" and thus preserving the " 'appearance' of that type of impartiality can hardly be a compelling state interest either." *Id.* at 778, 122 S.Ct. 2528.

Finally, the Court turned to the stated interest in preserving judicial open-mindedness. The court did not rule on whether this interest was compelling or whether the announce clause was necessary to protect this interest, because it concluded that the Minnesota Supreme Court did not adopt the announce clause for this purpose. The Court first noted that statements during a judicial campaign constitute an "infinitesimal portion of the public comments to legal positions that judges (or judges-to-be) undertake." *Id.* at 779, 122 S.Ct. 2528. Judges and judicial candidates have often committed themselves on issues they must later rule on, the Court noted. Those views are sometimes expressed through prior rulings from the bench, or

694

from public discussion, such as in books, articles, and speeches. Indeed, the Court pointed out that the Minnesota Code of Judicial Conduct encouraged such extra-judicial activities.

The Court was also troubled by the under-inclusiveness of the announce clause's goal of maintaining "open-mindedness" because the rule did not apply until the time a candidate announced his candidacy and promptly ended when the election was over. Thus, the Court stated, "[a]s a means of pursuing the objective of open-mindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous." *Id.* at 780, 122 S.Ct. 2528.

Having disposed of the justifications offered in support of the announce clause, the Court determined that Minnesota's announce clause violated the First Amendment. Shortly thereafter, the Kentucky Judicial Conduct Commission issued a memorandum in September 2002 stating that the *White* opinion did not invalidate Canon 5B(1)(c), since it did not contain an announce clause. (Pfs.' Memo in Supp. of Mot. for Prelim. Inj., Ex. D.) The Ethics Committee issued a similar memorandum in October 2002. *Id.*

### B. First Amendment Analysis

This case represents a perplexing intersection of an important state interest and a fundamental constitutional right: the interests of the state to ensure impartiality in the judiciary and the First Amendment rights of judicial candidates to express their opinions on legal issues, as well as the rights of voters to hear such information. At the outset of this analysis, it bears repeating that the very practice of electing judges undermines the state's interest in an actual and perceived impartial judiciary. *White,* 536 U.S. at 788, 122

S.Ct. 2528. Further, states like Kentucky which provide for the election of judges, have

> voluntarily taken on the risks to judicial bias.... As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling. If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.

*Id.* at 792, 122 S.Ct. 2528 (O'Connor, J., concurring).

When a state attempts to regulate "speech on the basis of its content and burdens a category of speech that is at the core of our First Amendment freedoms—speech about the qualifications of candidates for public office," strict scrutiny analysis is applied. *White,* 536 U.S. at 774, 122 S.Ct. 2528 (quotation omitted). In order to survive strict scrutiny, the state must prove that the abridgment of speech is narrowly tailored to serve a compelling state interest. *Id.* A state regulation, rule, or statute can violate the First Amendment either facially or as it is applied. *Anderson v. Spear,* 356 F.3d 651 (6th Cir.2004).

Here, the Plaintiffs contend that Canon 5B(1)(c) is facially overbroad, overbroad as applied, not necessary to achieve the state's interest in an impartial election, and impermissibly vague. Each argument will be addressed in turn.

#### 1. Facial Analysis

The Plaintiffs argue that the promises clause and the commit clause facially violate the First Amendment, *i.e.,* their literal meaning abridges the right to free speech. In bringing this facial challenge the Plaintiffs face "a heavy burden .... Facial invalidation is, manifestly, strong

medicine that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (quotations omitted). The Defendants argue that the clauses meet strict scrutiny, claiming that they serve the compelling need to maintain an impartial judiciary. The Court will address the justifications in the order they were dealt with in the *White* case: (1) preserving the impartiality of the judicial system by removing bias for or against either *party* in a court proceeding; (2) preserving the impartiality of the judicial system by removing preconceptions in favor of or against a particular *legal view;* and (3) preserving the impartiality of the judicial system by promoting "open-mindedness."

Canon 5B(1)(c), like the announce clause discussed in *White,* does not remove bias for or against a particular *party* because it deals only with particular *issues.* As Justice Scalia noted, the party taking the position contrary to the judge's view is more likely to lose not because of who he is, but because his opinion is contrary to the judge's. "*Any* party taking that position is just as likely to lose." *Id.* at 777, 122 S.Ct. 2528 (emphasis in original).

In *White,* the Supreme Court also dismissed the contention that removing preconceptions in favor of or against a particular view is a compelling state interest. The *White* Court noted that "[a] judge's predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice" because a lack of preconceived views on legal issues is a negative attribute for a potential judge. *Id.* at 777–78, 122 S.Ct. 2528. Thus, to the extent that the promises clause and the commit clause seek to remove any hint of predisposition, this cannot qualify as a compelling state interest.

The final justification provided by the state in *White* argued that the announce clause was a compelling state interest because it preserved the impartiality of the judicial system by promoting "open-mindedness," attempting to guarantee each litigant not an equal chance to win a case, but at least some chance of doing so. It also justified the clause by noting that it promoted the appearance of open-mindedness. Indeed, the Plaintiffs agree that the promises and commit clauses "serve a compelling interest: preserving the impartiality and appearance of impartiality of the courts." (Pfs.' Memo in Supp. of Mot. for Prelim. Inj. at 12.)

To the extent that the promises and commit clauses attempt to prevent judicial candidates from promising to rule a certain way on cases, controversies or issues likely to come before the court, the state has a compelling interest in such a restriction. The problem, however, is that the clauses are not so restricted and thus apply to a broad swath of promises that are not protected by any compelling government interest.

a. Speech Legitimately Regulated by the Clauses

As discussed *supra,* the *White* Court rejected the "open-mindedness" justification because it concluded that the announce clause was not drafted with these interests in mind. The *White* Court saw two problems with "open-mindedness" justification. First, it argued, if the state's real goal was to promote open-mindedness, it was contradictory to also encourage judges to express legal views through speeches and books. *Id.* at 779, 122 S.Ct. 2528. Second, the court found the clause "woefully underinclusive" because it did not cover speech prior to a judicial campaign and after a judge took office. *Id.* at 779–80, 122 S.Ct. 2528.

Regarding the first issue, while the announce clause may have seêmed at odds with the role of a lawyer or judge to write and discuss legal issues, the promises and commit clauses are not, *to the extent that they prohibit judicial candidates from promising to rule in a particular way on an issue likely to come before the court.* It is an entirely different matter for a judicial candidate to announce a view on a legal matter than it is for him to promise or commit to rule in a certain way. It is neither customary nor encouraged for judicial candidates or judges to make such promises or commitments. While we do expect judicial candidates to both consider and discuss legal issues, *White,* 536 U.S. at 777–78, 122 S.Ct. 2528, we do not expect them to pre-commit themselves to a particular outcome. There is a significant distinction between a *predisposition* to rule a certain way and a *commitment* to do so. A commitment to rule a certain way displays an unacceptable closed-mindedness, indicating that the candidate would not faithfully consider the arguments presented to him once an actual case is before him. A judge who has committed himself seriously erodes the public's confidence in the judiciary. As the Supreme Court has noted, "[t]he legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship." *Mistretta v. United States,* 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

Regarding the second issue, Canon 5B(1)(c) is not underinclusive, *to the extent that it prohibits judicial candidates from promising to rule in a particular way on an issue likely to come before the court,* because the only time a promise to rule a certain way has any meaning is in the context of a judicial campaign. If a lawyer simply announced one day "I promise to vote to overturn *Roe v. Wade,*" the state would not have a compelling interest to restrict that speech in furtherance of its goal of maintaining an "open-minded" judiciary because there would be no connection between the speech and the state's goal. Such a promise only takes on meaning when made in a judicial campaign. Thus, unlike a general announcement of position, which has the same impact whether made before or during a judicial campaign, a promise to rule a certain way is only relevant when made during a judicial campaign. Therefore, the promises clause and the commits clause do not suffer from the same underinclusiveness problem as the announce clause, *to the extent that they apply to prohibitions against promises to rule a certain way on issues likely to come before the court.*

b. The Overbreadth of the Clauses

Parties can bring an overbreadth claim to "challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). "There must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). The speech restriction's "application to protected speech [must] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth." *Virginia v. Hicks,* 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (citation omitted).

The problem with the clauses in Canon 5B(1)(c) is that they are not limited to

restricting campaign promises to rule a certain way on issues likely to come before the court. In pointing out that the pledges or promises clause was not at issue in *White,* Justice Scalia referred to the clause as "promising to decide an issue a particular way." *White,* 536 U.S. at 770, 122 S.Ct. 2528 (emphasis removed). The Kentucky promises clause, however, is not limited to "promising to decide an issue a particular way." Instead, it applies broadly to nearly all promises made during a campaign.

While the commit clause has a limitation applying it only to issues "likely to come before the court," this restriction does not limit the clause to a prohibition against committing to *rule* a particular way on an issues likely to come before the court; rather, it simply limits *any* commitment about any issue likely to come before the court.[8] For instance, a candidate subject to the commit clause presumably could not make the general commitment to "uphold the First Amendment," which is the type of legal opinion the Supreme Court found to be indispensable to a judicial election.

The promises clause is less restricted than the commit clause. It is only limited to the extent that a candidate can promise "the faithful and impartial performance of the duties of the office." Despite the fact that the Supreme Court of Kentucky admonished the Commission to redraft the judicial campaign canon to limit its application to "pending or future litigation," such a restriction was not included in the promises clause. *J.C.J.D.,* 803 S.W.2d at 956. Thus, a literal reading of the promises clause could mean it bars a simple promise to "be tough on crime."

Without a restriction limiting the two clauses to statements in which a candidate

promises to rule a particular way on an issue likely to come before the court, the clauses suffer from the same problems identified in *White* and discussed *supra,* namely, they contradict the typical role of attorneys and judges to speak on legal issues and they suffer from woeful underinclusiveness. A general prohibition against promises simply acts to chill an announcement of the type of views normally encouraged in the legal profession. Further, a general prohibition against promises is useless if it does not bar promises made before or after a judicial campaign. In effect, the types of general promises prohibited by the clauses are merely announcements of legal views, which the *White* and *J.C.J.D.* Courts found to be protected speech.

In analyzing the facial validity of the statute, it is appropriate to see how the state has interpreted and applied the statute in the past. *Lewis v. New Orleans,* 415 U.S. 130, 131–32, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). The two Kentucky Supreme Court cases dealing with the new version of Canon 5B(1)(c), *i.e., Summe* and *Deters,* involved an application of the canon that did not involve promises or commitments to rule a certain way on issues likely to face the court. In *Summe,* the judicial candidate had merely promised "not to let anyone walk away before justice is served." The Kentucky Supreme Court noted that "[w]hile in isolation, a judge who 'will let no one walk away before justice is served' is something to which all should aspire, in the context of the present judicial campaign, it represented appellant's commitment to prevent the probation of child abusers." *Summe,* 947 S.W.2d at 47. The *Deters* case involved even less egregious speech: the candidate

---

**8.** The *White* Court pointed out that this is not much of a restriction because "[t]here is almost no legal or political issue that is unlikely to come before a judge of an American court ...." *White,* 536 U.S. at 772, 122 S.Ct. 2528 (quotation omitted).

simply announced that he was "pro-life." According to the Supreme Court of Kentucky, this violated the promises clause.

The state has also sought to use the promises and commit clauses to prohibit statements "which appeal to prejudices or special interests." Ethics Committee of the Kentucky Judiciary, Judicial Ethics Opinion 85; Rules of The Kentucky Supreme Court, Canon 5B(1)(c), cmt.[9] Thus, the clauses have also been interpreted to prohibit speech which has no relation to an impartial judiciary. While these two interpretations are not binding and therefore do not, *ipso facto*, render the statute over-

broad, read in conjunction with the Kentucky Supreme Court's interpretation of the canon, it is clear that the state has construed the canons in very broad terms, encompassing vast categories of speech that the Supreme Court concluded were protected in *White*.

■ Finally, letters from Judge James Bowling, Chairman of the Ethics Committee of the Kentucky Judiciary and Chief Justice Joseph Lambert of the Supreme Court of Kentucky, indicate that the state does not intend to restrict its application of the clauses, in light of the *White* decision.[10]

---

9. At the October 15th hearing, the Court inquired why the Ethics Committee had not simply issued an advisory opinion informing candidates that it could respond to the questionnaire without fear of reprisal. Counsel suggested that there had not been enough time to address this issue. At the September 28th hearing, however, the Defendants indicated that they had learned of the lawsuit on September 24th, giving them *three weeks* to prepare for the preliminary injunction hearing. It seems hard to believe that it would require more than three weeks to prepare an advisory opinion, which is informal and usually only one or two pages.

The Defendants also complained that they were "ambushed" by the expedited handling of the preliminary injunction hearing. Preliminary injunctions, by their very nature, require expedited consideration. At the September 28th hearing the Court gave the parties two and half weeks to prepare for the October 15th hearing—a lifetime by preliminary injunction standards. In addition, the Defendants are represented by a cadre of competent attorneys. If a party seeking to defeat a preliminary injunction motion could simply argue that they did not have sufficient time to respond in order to defeat the motion, preliminary injunctions would never be granted. Parties opposing such motions are protected by the heightened standards a party must meet in order to obtain preliminary relief.

10. The Defendants claim that the letters from judges and judicial candidates cited by the Plaintiffs constitute inadmissible hearsay. They have, therefore, moved to exclude these

responses from the Court's consideration. The Sixth Circuit has not explicitly stated whether hearsay evidence may be considered in the context of a preliminary injunction. *DeLorean*, 755 F.2d at 1230 n. 4. District courts within this circuit have considered such evidence, as well as numerous other circuit courts. *Toledo Area AFL–CIO Council v. Pizza*, 898 F.Supp. 554, 558–59 (N.D.Ohio 1995), *aff'd in part, rev'd in part*, 154 F.3d 307; *F.T.C. v. Renaissance Fine Arts, Ltd.*, No. 1:94CV0157, 1994 WL 543048, at *8 (N.D.Ohio Sept.1, 1994); *KOS Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir.2004); *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir.2003); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir.1997); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir.1995); *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir.1993); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984); *cf. University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2949 (2d ed.1995) ("it is not surprising that in practice affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of Rule 56(e), and that hearsay evidence also may be considered"). After analyzing the relevant cases, it appears appropriate that this Court give some weight to the attached let-

In a memo sent to all "justices, judges, and judicial candidates" dated October 10, 2002, Judge Bowling wrote that *White* "does not impact Kentucky's canon on Judicial campaign statements" and the canon "remains effective as promulgated by the Supreme Court of Kentucky." [Exhibit F–12] The Commission sent a similar memorandum to all judges and judicial candidates stating that *White* did not impact the promises or commit clauses. [Exhibit D–2] A letter to all judicial candidates from Chief Justice Lambert did not reference *White*, but suggested that candidates seeking to interpret the judicial campaigning canon review the *Deters, Summe* and *Ackerson* cases, as well as *Doyle v. Judicial Retirement and Removal Comm'n*, 885 S.W.2d 917 (Ky.1994), which did not implicate the promises or commit clauses. [Exhibit D–1] Specifically, Chief Justice Lambert stated in his letter to candidates for judicial office that:

> During judicial campaigns, complaints may be filed against candidates for alleged violation of the Code of Judicial Conduct. SCR 4.300. Because the Code is vitally important to the Court of Justice, I want to take this opportunity to make you aware of it. The Judicial Conduct Commission has informed me that all complaints of alleged violation will be quickly and thoroughly investigated. Moreover, I am informed appropriate sanctions will be immediately levied against offending candidates.
>
> For your information, I enclose a copy of the Code, opinions rendered by the Ethics Committee of the Kentucky Judiciary and by the Judicial Conduct Commission, and Supreme Court Rules relating to campaigning. I suggest you also review the decisions rendered by the Kentucky Supreme Court in the cases of *Deters v. Judicial Retirement and Re-*

ters, even though they may be hearsay at this

*moval Commission, Ky.*, 873 S.W.2d 200 (1994); *Doyle v. Judicial Retirement and Removal Commission, Ky.*, 885 S.W.2d 917 (1994); *Summe v. Judicial Retirement and Removal Commission*, 947 S.W.2d 42 (1997); and the federal district court case of *Ackerson v. Kentucky Judicial Retirement and Removal Commission*, 776 F.Supp. 309 (W.D.Ky. 1991).

Thus, the state has not given *any* indication that it intends to limit its promises or commit clauses in light of the Supreme Court's ruling in *White*.

The interpretation and application of the promises and commit clauses in Canon 5B(1)(c) have clearly been used by the state to reach the same speech the Kentucky Supreme Court concluded was protected by the First Amendment in *J.C.J.D., i.e.*, information on the legal issues of interest to the voting public, including a candidate's "personal views and beliefs." *J.C.J.D.*, 803 S.W.2d at 956. Kentucky is simply using the promises and commit clauses as a *de facto* announce clause. *See* Matthew D. Besser, Note, *May I Be Recused? The Tension Between Judicial Campaign Speech and Recusal After Republican Party of Minnesota v. White*, 64 Ohio St. L.J. 1197, 1211 (2003) ("Under the Kentucky supreme court's analysis ... the judicial candidate's mere announcement of a position on an issue equates to a violation of the commit clause. Such an interpretation is at odds with the purpose of the commit clause to be less restrictive of the First Amendment rights of judicial candidates than the announce clause, while still upholding the appearance of impartiality in the courts. Indeed, if the Kentucky supreme court's analysis were correct, there would be no difference between the two clauses and

stage of the proceedings.

thus the commit clause would likely be unconstitutional for the same reasons that doomed the announce clause in *Republican Party of Minnesota.*"); Jan Baran, *Judicial Candidate Speech After Republican Party of Minnesota v. White,* 39 Ct. Rev. 12, 13 ("If judicial commissions apply the pledges and promises clause as broadly as the Minnesota commission interpreted its announce clause, it will suffer a similar constitutional fate.")

Two state courts have upheld challenges to their promises clause brought in the wake of *White.* *Re: Patricia Kinsey,* 842 So.2d 77 (Fla.2003), *cert. denied,* 540 U.S. 825, 124 S.Ct. 180, 157 L.Ed.2d 47 (2003); *In the Matter of William Watson,* 100 N.Y.2d 290, 763 N.Y.S.2d 219, 794 N.E.2d 1 (N.Y.2003). In the first case, Judge Kensey was charged with twelve counts of violating Florida's ethical canons governing judicial elections. The Florida Supreme Court noted that

> [a]lthough some of these charges taken in isolation would not violate the judicial canons, taken together it becomes clear that Judge Kinsey was running on a platform which stressed her allegiance to police officers. Each of the charges addressed above involved implicit pledges that if elected to office, Judge Kinsey would help law enforcement. Through these statements, Judge Kinsey fostered the distinct impression that she harbored a prosecutor's bias and police officers could expect more favorable treatment from her as she promised to support police officers and help them put criminals behind bars. She also made pledges to victims of crime, promising to bend over backward for them and stressing the point that she identified with them "above all else," thus

giving the appearance that she was already committed to according them more favorable treatment than other parties appearing before her. By disseminating materials which promised a different treatment based on the identity of the person appearing before her, it is beyond question that these promises affect her appearance of impartiality and fitness as a judge. While our judicial code does not prohibit a candidate from discussing his or her philosophical beliefs, in the campaign literature at issue Judge Kinsey pledged her support and promised favorable treatment for certain parties and witnesses who would be appearing before her (i.e., police and victims of crime).

*Kinsey,* 842 So.2d at 88–89. Thus, the Florida Supreme Court restricted its canon to cases in which the candidate had "promised favorable treatment for certain parties and witnesses who would be appearing before her" and specifically noted that a candidate is not precluded from discussing his legal beliefs.[11] *Kinsey* is distinguishable because Kentucky courts have yet to limit its canons in such a manner.

In *Watson* the Court of Appeals of New York similarly limited the promises clause, noting that "[a]s its literal language suggests, the restriction is not a blanket ban on promises; a judicial candidate may promise future conduct provided such conduct is not inconsistent with the faithful and impartial performance of judicial duties." *Watson,* 763 N.Y.S.2d 219, 794 N.E.2d at 6. This restriction on the promises clause, however, is not supported by a literal reading of the clause. New York's promises clause, like Kentucky's, prohibits making "pledges or promises of conduct in

---

**11.** Even with this limited reading, Justices Wells and Quince dissented from the majority's opinion, concluding that the opinion runs

"contrary to the United States Supreme Court decision [in *White* ] by which we are bound." *Id.* at 100 (Wells, J., dissenting).

office other than the faithful and impartial performance of the duties of the office." Thus, the rule does not allow a candidate to "promise future conduct provided such conduct is not inconsistent with the faithful and impartial performance of judicial duties," *id.*, rather, it prohibits making *any* promises, except for those promising to faithfully and impartially perform one's judicial duties.

The semantic difference is important because New York's interpretation of the clause would allow significantly more speech than a literal reading of the clause would allow. Under New York's interpretation, a promise "to be tough on crime" would not implicate the clause because it is not "inconsistent with the faithful and impartial performance of duties." It would violate a literal reading of the clause, however, because it is not a promise to either be faithful or impartial, or both. Again, the restrictions imparted by the state courts in Florida and New York, which limited the clause's scope, have not been made by Kentucky courts.

If a statute is "readily susceptible" to a limiting instruction that would render it constitutional, the speech restriction will be upheld. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). However, "[t]he key to application of this principle is that the statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements." *Id.* Given the broad swath of legitimate speech implicated by the canon, e.g., "I promise to be tough on crime" or "I promise to uphold the First Amendment," and the narrow circumstances in which the law's reach is legitimate, *e.g.*, "I promise to never invalidate a search on Fourth Amendment grounds," the canon would require a significant restriction to pass constitutional muster. Canon 5B(1)(c) re-

quires some sort of limitation applying it to promises to rule a certain way regarding cases, controversies or issues likely to come before the court. A federal court, however, lacks the power to authoritatively construe a state statute. Therefore, any attempt by a federal court to "cure" such a statute cannot save it. *United States v. Thirty–Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

### 2. "As Applied" Analysis

The Defendants have yet to state their opinion on whether answering the questions found in the Family Foundation survey would violate the promises or commit clauses. According to the Defendants, this precludes any "as applied" analysis in this case.

The survey states in bold print on the first page: "YOUR RESPONSES INDICATE YOUR CURRENT VIEW ON THE LEGAL ISSUES AND DO NOT CONSTITUTE ANY PLEDGE, PROMISE, OR COMMITMENT TO RULE IN ANY PARTICULAR WAY IF THE LEGAL ISSUE INVOLVES COMES BEFORE YOU FOR DECISION." Yet, numerous judges claimed Canon 5B(1)(c) prevented them from answering the survey. Their reluctance is understandable, given the lack of limiting language in the canon and the broad manner in which it has been applied by the state. The questions all seem to involve dissemination of the type of legal opinions the *White* and *J.C.J.D.* courts considered essential to any democratic election, even one for the judiciary. None of the questions are styled to imply any promise or commitment on the part of the answerer. They merely seek to elicit the candidate's views on contentious legal issues.

### 3. Necessity of the Clauses

When strict scrutiny analysis applies, even a statute promoting a compelling

state interest will not be upheld unless the statute is also necessary to serve that interest. In the *Deters* case, Justice Wintersheimer (joined by (then-)Justice Lambert), provided a compelling argument that the promises and commit clauses were not necessary to insure impartiality. He argued that Canon 5B(1)(c) did not meet the strict scrutiny test because it was not necessary to achieve the state's objectives. *Deters*, 873 S.W.2d at 206. He noted that Kentucky's recusal rules insured impartiality by requiring recusal any time a judge could not render, or appeared incapable of rendering, a fair and impartial decision, as codified in Kentucky Supreme Court Rule 4.300, Canon 3(E)(1) and K.R.S. § 26A.015(2)(e). Thus, he argued, the promises and commit clauses are not necessary to ensure impartiality. *Id.; see also* Bradley S. Clanton, *Suppressing Speech in Judicial Elections: How the Canons of Judicial Ethics Abridge the Freedom of Speech of Judges and Candidates for Judicial Office*, 21 Miss. C.L.Rev. 267, 292–93 (2002).

Kentucky's recusal provisions ensure impartiality without restricting constitutionally-protected speech. Of course, the clauses serve some additional benefit by ensuring the *appearance* of impartiality by preventing the candidates from making any public statements which might appear to taint their neutrality. The public, however, is certainly aware of Kentucky's recusal statutes and must also be aware that they prevent a judge who appears incapable of rendering a fair decision from deciding a case. Thus, the public's confidence in the judiciary is likewise protected by the recusal statutes and it appears that Canon

5B(1)(c) is not necessary to ensure "open-mindedenss." [12]

### 4. Vagueness

■ Finally, the Plaintiffs argue that the commit clause is impermissibly vague because, in addition to implicating actual commitments, it forecloses statements by judicial candidates that "appear to commit" them to a certain outcome. The Plaintiffs argue that while the prohibition against commitments might be clear, it is difficult for a judicial candidate to know when they are "appearing" to commit themselves to a particular outcome.

A law can be challenged as vague for either of two reasons: (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Vague statutes or regulations are objectionable if

> [f]irst, they trap the innocent by not providing fair warning. Second, they impermissibly delegate basic policy matters to lower level officials for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, when vague statutes involve sensitive areas of First Amendment freedoms, they operate to inhibit the exercise of those freedoms.

*Cal. Teachers Ass'n v. Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir.2001) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). "[V]agueness concerns are more

---

**12.** The existence of the recusal rules would not necessarily invalidate a more restricted version of the promises and commit clauses. A campaign promise to rule a certain way on a legal issue likely to face the court is so

uniquely destructive of open-mindedness and confidence in the judiciary that recusal might not satisfactorily protect the state's interest in maintaining judicial open-mindedness.

acute when a law implicates First Amendment rights and, therefore, vagueness scrutiny is more stringent." *Id.*

The Oxford English Dictionary defines commit (in the sense used in Canon 5B(1)(c)) as "to engage or pledge by some implicative act (to a particular course)." Oxford English Dictionary (2d ed.1989). "Implication," is defined as "what is implied though not formally expressed, by natural inference." *Id.* Thus, a commitment is distinguishable from a promise because the latter is affirmatively expressed and the former is not.

The question arises: can people of ordinary intelligence determine what speech constitutes an "appearance of commitment" without qualifying as an actual commitment? It seems that a person of ordinary intelligence could determine most circumstances in which a statement might appear to commit him to an issue, even though the candidate did not consider it a commitment. There could be situations at the margins, however, in which reasonable people might disagree whether a candidate "appears to have committed" to a particular issue. In these situations, the determination might be made in the type of ad hoc and subjective manner that is typically disfavored when dealing with protected speech. As with overbreadth, however, a court can only facially invalidate a statute for vagueness if the statute chills a substantial amount of protected speech. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). While the "appear to commit" language may be overbroad, as discussed *supra,* it does not appear to be impermissibly vague because the speech it implicates "at the margins" is insignificant.

In summary, based on the foregoing analysis the Court concludes, for purposes of the pending motion for injunctive relief,

that the broad language of Canon 5B(1)(c) impermissibly burdens free speech and violates the First Amendment to the United States Constitution. While it does properly regulate some speech, (*i.e.,* promises to rule a certain way on an issue likely to face the court), its language prohibits broad areas of speech the Supreme Court found to be protected in *White.* The Kentucky Supreme Court's interpretation of the canon has done nothing to limit its literal application. For instance, that court upheld application of the canon to a judicial candidate who simply announced he was a "pro-life" candidate in the *Deters* case. And in *Summe,* the court upheld application of the canon to a judicial candidate who simply stated that she would "let no one walk away before justice is served." These types of general policy statements are exactly the type of speech *White* considered essential to the democratic process and protected by the First Amendment.

As Justice Scalia wrote,

[d]ebate on the qualifications of candidates is at the core of our First Amendment freedoms, not at the edges. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance. It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign. We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.

*White,* 536 U.S. at 781–82, 122 S.Ct. 2528 (quotations omitted).

Further, as Justice O'Connor noted in her concurring opinion in *White,* when a state decides to elect its judiciary, it must accept the fact that the state interest in maintaining impartiality (and the appear-

ance of it) will likely suffer some harm. *Id.* at 792, 122 S.Ct. 2528 (O'Connor, J., concurring). The state cannot, however, attempt to have it both ways by electing its judiciary yet simultaneously gagging its judicial candidates and thus preventing the voting public from receiving the information necessary to cast an informed vote. While a state may dispense with judicial elections altogether, it does not have the "power to conduct elections under conditions of state-imposed voter ignorance. If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process the First Amendment rights that attach to their roles." *Id.* at 788, 122 S.Ct. 2528.

As the Court has held, however, certain campaign promises are uniquely destructive to the state's interest in impartiality and open-mindedness, thus justifying some limited state restriction on campaign speech that would meet the burdens of strict scrutiny. The most obvious such restriction would be a blatant promise to rule a particular way on an issue likely to come before the court. Professor Stephen Gillers suggests replacing the promises and commit clauses with a canon which states: "A candidate for judicial office may state his or her general views on legal issues, but must make it clear that these views are tentative and subject to arguments of counsel and deliberation." Stephen Gillers, National Symposium on Judicial Campaign Conduct and the First Amendment: *"If Elected, I Promise [ ]"What Should Judicial Candidates Be Allowed to Say?,* 35 Ind. L.Rev. 725, 733–34 (2002). The Commonwealth can decide, of course, how best to restrict legitimately regulable judicial campaign speech. This Court merely holds that Canon 5B(1)(c), both in the way it was drafted and the way it has been applied by the state courts, impermissibly restricts constitutionally protected speech. The canon is overbroad, rather than underinclusive, by targeting both legitimately regulable speech and constitutionally protected speech.

### C. Preliminary Injunction Factors Applicable to Canon 5B(1)(c)

▆ The Court must now balance the four preliminary injunction factors: (1) the likelihood of success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction.

### 1. Likelihood of Success on the Merits

As discussed *supra,* the Court concludes that the Plaintiffs have a likelihood of succeeding on the merits.

### 2. Irreparable Injury

At this time, it is difficult to determine whether the Plaintiffs will also be saved from irreparable injury by issuance of the preliminary injunction. While numerous candidates cited Canon 5B(1)(c) as a reason not to answer the survey, it is unclear whether a preliminary injunction will provide the Plaintiffs with the information to which they are entitled in time for the election. Although the Court indicated it was willing to hold the hearing for this matter on October 4th or 5th, due to the pressing time constraints, counsel for the Plaintiffs indicated that they would only be available for a hearing on certain days during the holiday-shortened work-week of October 12–15.

Because the hearing was held just over two weeks before the election, it is unclear whether a preliminary injunction will have any practical effect at this late stage in the campaign. It seems unlikely that Family Foundation could conduct a new survey

and disseminate information in time for voters to receive that information before the election. The original Family Foundation survey indicated its deadline was August 6th, which gave it nearly three months to compile and publish its report before the election. With the current time line, they have only two weeks.

The two citizen-plaintiffs, however, may be aided by simply having the ability to hear candidates voice their opinions on legal issues, even if the survey is not released in time. Presumably, such dissemination of information could occur in the remaining two weeks, through either informal campaigning, candidate advertisements, or media coverage. In any event, this short time period does not persuade the Court that injunctive relief should not be granted.

### 3. Harm to Others

The injunction would not harm others, except to the extent it could harm the public interest. It would provide a benefit to the judicial candidates who wish to express their opinions but feel constrained by Canon 5B(1)(c).

### 4. The Public Interest

The Defendants contend that the injunction would harm the public interest by removing an essential part of the rules governing judicial campaigns. As discussed *supra*, however, the United States Supreme Court and Supreme Court of Kentucky have significantly downplayed the importance of these types of state interests in *White* and *J.C.J.D.* Indeed, as the *J.C.J.D.* Court observed, "a well informed electorate is essential to the democratic election process guaranteed by the Kentucky Constitution. The rights of the voting public to hear what a candidate has to say is a compelling one." *J.C.J.D.*, 803 S.W.2d at 956.

Further, Justice Wintersheimer's dissent in *Deters* provides a compelling argument that Kentucky's judicial recusal rules are sufficient to protect the public interest by ensuring that judges whose "impartiality might reasonably be questioned" disqualify themselves from a case, as discussed *supra.* Kentucky Supreme Court Rule 4.300, Canon 3(E)(1); *see also* K.R.S. § 26A.015(2)(e). These provisions ensure impartiality without burdening constitutionally-protected speech. Thus, the harm to the public appears to be minimal at best.

## IX. K.R.S. § 26A.015(2)(e) and Canon 3E(1)

As noted above, the Plaintiffs have also challenged the constitutionality of K.R.S. § 26A.015(2)(e) and Canon 3E(1) relating to the recusal obligations of judges. K.R.S. § 26A.015(2)(e) provides that "[a]ny justice or judge ... shall disqualify himself in any proceeding: ... (e) [w]here he has knowledge of any other circumstances in which his impartiality might reasonably be questioned." Canon 3E(1) contains similar language as its statutory counterpart and provides that a judge must disqualify himself when the "judge's impartiality might reasonably be questioned ..." Kentucky Supreme Court Rule 4.300, Canon 3E(1).

The Plaintiffs contend that K.R.S. § 26A.015(2)(e) and Canon 3E(1), as applied to the 2004 Candidate Survey, are unconstitutional because they "chill speech" that is protected by the First Amendment. Specifically, the Plaintiffs argue that both the statute and the canon can be applied to require judges to who have engaged in constitutionally protected political speech to recuse themselves from proceedings involving issues about which they have spoken.

Much like their challenge to Canon 5B(1)(c), the Plaintiffs assert that the recusal statute and Canon 3E(1) cannot survive the strict scrutiny test inasmuch as they are not narrowly tailored to serve the state's compelling interest in protecting the impartiality and appearance of impartiality of its judiciary. In addition, the Plaintiffs contend that the statute and canon are vague and overbroad and, therefore, must be struck down as unconstitutional.[13]

A. The Recusal Canon and Statute Are Narrowly Tailored to Serve a Compelling State Interest.

According to the Plaintiffs, the recusal statute as applied has the effect of "chill[ing] speech" that burdens a category of speech that is at the core of our First Amendment freedoms-speech announcing views on disputed legal and political issues. Specifically, the Plaintiffs assert that they do so by requiring judicial candidates to decline to announce their views on various issues for fear they may have to later recuse themselves if that issue later arises in a case before them.

Because the recusal statute and canon burdens speech to the extent that judges may be hesitant to express their views on various issues for fear they may later have to recuse themselves from cases that come before them which involves those issues, the proper test to be applied in determining the constitutionality of K.R.S. § 26A.015(2)(e) and Canon 3E(1) is strict scrutiny. Under this test, the Defendants must demonstrate that the recusal statute and canon are narrowly tailored to serve a compelling state interest. *White*, 536 U.S. 765, 122 S.Ct. 2528. The Plaintiffs allege that K.R.S. § 26A.015(2)(e) and Canon 3E(1) cannot survive the strict scrutiny test because "the broad, sweeping language" of the recusal statute and canon is not narrowly tailored to serve the state's interest in preserving impartiality, regardless of the definition of impartiality used by the Court. *See White*, 536 U.S. 765, 122 S.Ct. 2528 (discussing three possible definitions of impartiality).

Initially, the Court must determine whether the recusal statute and canon serve a compelling state interest. The statute and canon require a judge to recuse himself when his impartiality may reasonably be questioned. This does not necessarily mean his impartiality is actually compromised, but rather that it appears to be. As previously discussed, the Supreme Court in the *White* decision identified three possible meanings of impartiality in the judicial context, which included: (1) preserving the impartiality of the judicial system by removing bias for or against either *party* in a court proceeding; (2) preserving the impartiality of the judicial system by removing preconceptions in favor of or against a particular *legal view;* and (3) preserving the impartiality of the judicial system by promoting "open-mindedness," seeking "to guarantee each litigant not an equal chance to win" a case, "but at least some chance of doing so." *Id.* at 775–84, 122 S.Ct. 2528.

Impartiality in the context of recusal has been fairly well defined. At common law, recusal for judicial bias or prejudice regarding a party was not permitted. Justice Blackstone stated that, "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." *See Aetna Life Ins. v. Lavoie,*

---

13. Although the Court will address the merits of the Plaintiffs' claims regarding the recusal statute and related canon, it appears that the Plaintiffs cannot meet the requirements of injury in fact, causation or ripeness with respect to the challenged recusal provisions.

475 U.S. 813, 820, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (citing 3 W. Blackstone, Commentaries 361). More recently, however, the law has generally viewed recusal more favorably.

In 1792, Congress passed a statute requiring federal district judges to recuse themselves whenever they had an interest in the suit before them or had served as counsel to a party in the suit. *See Liteky v. United States,* 510 U.S. 540, 544, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The grounds for recusal were expanded in 1821 to cover any judicial relationship or connection with a party that the judge felt would make it improper to preside over the case. *Id.* In 1911, however, Congress passed a statute requiring district judges to recuse themselves for bias in general. *Id.*

The modern view of judicial disqualification is contained in Canon 3E(1) of the Kentucky Code of Judicial Conduct, which requires judges to recuse in those proceedings in which impartiality "might reasonably be questioned." The canon then lists four specific instances in which a judge must recuse, thereby providing examples of those situations in which the state feels judges should avoid in order to maintain impartiality or the appearance of impartiality. Specifically, the canon provides that judges must recuse themselves where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or judge's spouse, or a person within the third degree of relationship to either or them, or the spouse of such a person;

(i) is a party to the proceeding, or an officer, director or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

Kentucky Supreme Court Rule 4.300, Canon 3E(1).

Unlike the announce clause discussed in *White,* Canon 3E(1) and K.R.S. § 26A.015(2)(e) do, in fact, aid in removing bias for or against a party to the proceeding. As noted in *White,* impartiality in this sense assures equal protection of the law. An impartial judge is essential to due process. Certainly, this is a compelling state interest inasmuch as the authority of the judiciary relies upon public faith in the integrity of its judges. A widespread belief that the courts are not impartial-resulting in a loss of public faith in the legal system and thus an unwillingness to respect its authority-would destroy the judiciary as quickly as would an actual lack of impartiality. The public and individual litigants must be reassured that the judiciary

will decide legal disputes based on the law alone.

The recusal statute and canon are certainly narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense. Their purpose is to guarantee to those parties that have a case before the judge that he will apply the law to them in the same way in which he would apply it to any other party. In those instances when a judge may have a particular bias to one party over another or when it may appear that he favors one party, the recusal laws mandate that he remove himself from the case.

The *White* Court dismissed the contention that removing preconceptions in favor of or against a particular legal view was a compelling state interest. Specifically, the Court stated that the fact that a judge has no predisposition regarding particular legal issues in a case before him "has never been thought a necessary component of equal justice [in part because] it is virtually impossible to find a judge who does not have preconceptions about the law." *White*, 536 U.S. at 777, 122 S.Ct. 2528. In light of the Court's holding in *White*, to the extent the recusal laws attempt to serve this interest, the Court finds that impartiality in this sense is not a compelling state interest.

The final meaning of impartiality discussed in *White* was that of "open-mindedness." The Court noted that "[t]his quality in a judge demands, not that he have no preconceptions on legal issue, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issue arise in a pending case." *White*, 536 U.S. at 778, 122 S.Ct. 2528. Impartiality in this sense seeks to guarantee each litigant, not an equal chance to win the case, but at least some chance of doing so. As previously noted, the Court did not consider this justification because it found that the announce clause was not adopted by the Minnesota Supreme Court for that purpose. However, the recusal laws certainly serve the state's interest in impartiality.

Judges are expected to be open-minded in regard to cases over which they preside. It is often said that to maintain the requisite degree of impartiality, judges should not predetermine their decisions. In other words, they should keep an open mind about the outcome of a case until all of the evidence and arguments have been presented. The recusal laws mandate that a judge voluntarily disqualify himself from a case in which he feels that he cannot be open-minded. As such, the Court finds that Canon 3E(1) and K.R.S. § 26A.015(2)(e) are narrowly tailored to serve this state's interest in impartiality in this sense.

B. Overbreadth of the Recusal Laws

 The Plaintiffs also argue that Canon 3E(1) and K.R.S. § 26A.015(2)(e) are "unconstitutionally overbroad." According to the Plaintiffs, the "unduly broad and discretionary" language of the statute and canon has the effect of "chill[ing] speech that is constitutionally protected—including speech announcing views on dispute legal and political issues". The Plaintiffs contend that these recusal laws are overbroad inasmuch as they cause judges to decline to announce their views on any issues for fear they will need to recuse in all future cases which deal with issues upon which they have expressed a view.

As previously discussed, the Plaintiffs, in bringing a facial challenge to the overbreadth of a law, face a difficult task inasmuch as courts typically invalidate laws based on these grounds "with hesitation" and "only as a last resort." *Finley*, 524 U.S. at 580, 118 S.Ct. 2168 (quotations omitted). In a facial challenge to the over-

breadth of a law, a court's first task is to determine whether the law punishes a "substantial" amount of protected free speech. However, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law..." *Hicks*, 539 U.S. at 118–19, 123 S.Ct. 2191.

As discussed *supra*, the Supreme Court has held that the speech restriction's "application to protected speech [must] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth." *Id.* (citation omitted). The claimant challenging the law as being unconstitutionally overbroad bears the burden of demonstrating, "from the text of [the law] and from actual fact," that substantial overbreadth exists. *Id.* at 121, 123 S.Ct. 2191 (citing *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988)).

The Plaintiffs in this case have not made such a showing with respect to Canon 3E(1) and K.R.S. § 26A.015(2)(e). Although the recusal laws may, in effect, curtail some speech by judges, the fact remains that the state has a legitimate interest in encouraging public faith in the judiciary. In her dissent in *White*, Justice Ginsburg noted this tension and recognized the need for balancing a judicial candidate's First Amendment right to free speech and the due process rights of the litigants before the judge. Specifically, she noted that an important requirement of due process is that each litigant is entitled to a proceeding in which the judge has no interest in a particular outcome. According to Justice Ginsburg, judges hearing cases involving issues upon which they spoke during their campaigns have a suffi-

cient interest in the outcome such that due process is violated.

However, due process concerns do not necessarily *require* recusal in every case in which a judge has expressed an opinion. As noted by the majority of the Court in *White*, "it is virtually impossible to find a judge who does not have preconceptions about the law." Based on this fact, the *White* Court held that there is no compelling state interest in having a judiciary lacking any legal preconceptions. If a judge would act in the same manner during his campaign, whether or not he expressed views on an issue in the case presently before him, then the mere expression of that view should not make him less impartial. Because all judges come to the bench with views about the law, whether or not they have been publicly expressed, the fact that a judicial candidate expresses his views during the campaign does not make him any more or less predisposed to reach a certain conclusion of law than any other judge. Thus, recusal is not required in every instance in which a judge has expressed a view—publicly or not—on a certain issue.

The Supreme Court noted in *Broadrick* and, most recently, in *Virginia*, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law." *Virginia*, 539 U.S. at 119, 123 S.Ct. 2191 (citing *Broadrick*, 413 U.S. at 615). While the recusal laws may have the effect of chilling some speech, the Court cannot conclude that in light of the state's compelling interest in maintaining the impartiality and appearance of impartiality of the courts that Canon 3E(1) and K.R.S. § 26A.015(2)(e) prohibits a "substantial" amount of protected speech in relation to its many legitimate applications. Certainly, if the Court were to invalidate the recusal laws based on

overbreadth, then the state's ability to safeguard the impartiality or appearance of impartiality of the judiciary would be greatly compromised.

### C. Vagueness of the Recusal Laws

■ The Plaintiffs also argue that Canon 3E(1) and K.R.S. § 26A.015(2)(e) are unconstitutionally vague. Specifically, the Plaintiffs argue that the statute and canon are unconstitutionally vague because they require judges to recuse when their impartiality might be "reasonably questioned." According to the Plaintiffs, the "reasonably question" standard is "too ambiguous" and "all-encompassing" and, therefore, judges are unable to determine those specific instances when recusal is proper. As previously noted, a law can be challenged as vague for because "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill,* 530 U.S. at 732, 120 S.Ct. 2480.

With respect to the recusal laws, the issue before the Court is whether a judicial candidate of ordinary intelligence can determine those instances, if any, in which his impartiality might "reasonably be questioned." According to the Plaintiffs, this standard for recusal is so vague that judicial candidates will refrain from announcing their views on any issues for fear that they will later be precluded from hearing cases involving those issues.

Occasionally, a judge may not be able to determine whether general campaign statements about an issue may cause a litigant appearing before him to reasonably question his ability render an impartial decision. However, as previously discussed, the judge, in most instances, can determine those circumstances in which a statement might appear to commit him to

an issue and thus require recusal from a case involving that issue. Because a court can only facially invalidate a statute for vagueness if the statute chills a substantial amount of protected speech, the Court finds that the "reasonably question" language of the recusal statute and canon is not impermissibly vague. *Young,* 427 U.S. at 60, 96 S.Ct. 2440.

### D. Preliminary Injunction Factors Applicable to Canon 3E(1) and K.R.S. § 26A.015(2)(e)

#### 1. Success on the Merits

■ For the reasons discussed above, the Court concludes that the Plaintiffs do not have a likelihood of succeeding on the merits with respect to their constitutional challenge of the recusal laws.

#### 2. Irreparable Injury

The Plaintiffs will not suffer irreparable injury if their request for injunctive relief regarding the recusal statute and canon is denied. As noted above, the individual Plaintiffs are not judicial candidates and are not subject to any penalty from the Defendants. Likewise, while judicial candidates will be able to respond to appropriate questions *if they so choose,* they will not be forced to answer any of the questions contained in the Family Foundation's questionnaire if they decide not to answer these questions.

#### 3. Harm to Others

The Defendants argue that to the extent the injunction will prevent enforcement of the Canons of Judicial Conduct, it will cause substantial harm because it would "eviscerate Kentucky's mechanism for insuring impartiality and independence of the courts." To the extent that the Plaintiffs are seeking injunctive relief to prevent the Defendants from enforcing the

recusal laws, the Court agrees that such injunction would harm to the public inasmuch as the state has a compelling interest in maintaining the impartiality and appearance of impartiality of its judiciary and the public has the right to expect a fair and impartial judiciary regardless of the manner in which judges are selected. Restricting the Defendants' ability to enforce the recusal laws risks undermining both of these valuable interests.

### 4. The Public Interest

As discussed *supra*, to the extent the Plaintiffs are seeking an injunction to prevent the Defendants from enforcing the recusal laws, the Court finds that such injunctive relief would eliminate the safeguard in place that protects the public's interest in having a fair and impartial judiciary. Thus, the Court finds that this type of injunctive relief would cause harm to the public.

### X. Conclusion

Nothing in this opinion compels any sitting judge or candidate for judicial office to answer any question concerning his or her opinion on any issue presented by the Family Foundation or any other entity or individual. However, because Kentucky has chosen to select its judges by popular election, the Defendants may not restrict their ability to communicate their ideas and views under the guise of prohibiting promises, pledges or commitments.

Similar to the provision stricken in *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), one of the canons in issue (Canon 5B(1)(c)) prohibits more than is immediately apparent from its text. Again, as Justice Scalia highlighted in *White,* " '[d]ebate on the qualifications of candidates' is 'at the core of our electoral process and of the First Amendment freedoms,' not at the

edges. 'It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign.' " *Id.* at 781, 782, 122 S.Ct. 2528.

Having chosen this manner of selecting judges, the Commonwealth must recognize that it cannot undermine the process by limiting debate in the manner it has chosen. While narrowly drawn limits may serve a compelling governmental function, the limits imposed here do not meet the test of strict scrutiny. And as Justice Scalia aptly noted, " '[t]he greater power to dispense with elections [of judicial candidates in favor of merit selection process] does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance. If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process .... the First Amendment rights that attach to their roles.' " *Id.* at 788, 122 S.Ct. 2528.

Here, Kentucky's canon of judicial conduct that professes to prohibit candidates from making promises, pledges or commitments in fact limits the candidate's ability to announce his or her views in violation of the First Amendment to the United States Constitution. Accordingly, it is hereby

**ORDERED** as follows:

1. The Defendants' motion to exclude attachments (judicial candidates' responses) to the Plaintiffs' memorandum filed in support of their motion for injunctive relief is **DENIED**.

2. The Plaintiffs' motion for injunctive relief is **GRANTED**, in part, with respect to Supreme Court Rule 4.300, Canon 5B(1)(c). The motion is **DENIED** with respect to Kentucky's recusal statute, K.R.S. § 26A.015 and Supreme Court Rule 3E(1).

3. The Defendants are hereby **EN-JOINED** and **PROHIBITED** from enforcement of Supreme Court Rule 4.300, Canon 5B(1)(c), with respect to any candidate for state judicial office. This injunction does not limit or otherwise prevent the subsequent recusal of a candidate, if elected, with respect to any statements he or she may make.

4. This injunction is issued at 10:00 a.m. on Tuesday, October 19, 2004 and shall become effective upon the Plaintiffs posting a cash or surety bond in the sum of five hundred dollars ($500.00). However, the injunction will be held stayed for 48 hours (until Thursday, October 21, 2004, at 10:00 a.m.) to allow the Defendants to seek appellate review of this decision. Accordingly, the Defendants' motion to stay the effect of this Order is **GRANTED**, in part.

5. The Clerk of the Court is directed to forward a copy of this Memorandum Opinion and Order by regular mail and fax to all counsel of record.